**Anthony Joseph MAJOY, Petitioner,**

v.

**Ernest ROE, Warden, Respondent.**

**No. CV 98–6956 SVW (JWJx).**

United States District Court,
C.D. California,
Western Division.

Aug. 4, 2009.

---

ORDER ADOPTING SECOND SU-
PERSEDING REPORT AND REC-
OMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

In an order dated July 11, 2002, the Ninth Circuit remanded Petitioner Antho-

ny Majoy's habeas corpus petition to this Court to determine whether Petitioner's case meets the exacting threshold of "actual innocence" from *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), such that his otherwise procedurally barred habeas petition can proceed on the merits. *See Majoy v. Roe,* 296 F.3d 770 (9th Cir.2002). The Magistrate's Second Superseding Report and Recommendation ("SSRR") details why Petitioner's claims do not meet the actual innocence standard from *Schlup.* Having thoroughly reviewed the record de novo, the Court agrees with the Magistrate's findings and adopts with the Magistrate's Report. The Court writes separately, however, to address Petitioner's objections to the SSRR and to emphasize certain aspects of the case.

## II. STANDARD OF REVIEW

### A. Petitioner's Request for Further Oral Arguments

■ As an initial matter, Petitioner requests that the Court hold independent oral arguments as part of its de novo review of the Magistrate's SSRR. Petitioner relies in part on *United States v. Remsing,* 874 F.2d 614 (9th Cir.1989), where the Ninth Circuit stated that a district court may hold oral arguments in response to objections to a magistrate's report and recommendation. Petitioner quotes *Simmons v. Revenue Officers,* 865 F.Supp. 678, 679 (D.Idaho 1994), where the court said: "It is a statutory and constitutional obligation of the district court 'to arrive at its own independent conclusions about those portions of the magistrate's report to which objections are made.'" *Id.* (quoting *Remsing,* 874 F.2d at 618).

The facts of *Remsing,* however, differ significantly from those involved in this case. In *Remsing,* there were no transcripts of the magistrate's hearings, the district court never listened to the voice

records from the hearings, and the magistrate's recommendation was delivered orally. 874 F.2d at 616. Furthermore, the district court openly admitted to not fully understanding the magistrate's recommendation or the objections to the recommendation because of the "lack of specificity of findings of fact made by the magistrate." *Id.* The district court nevertheless adopted the magistrate's recommendation and granted defendant's motion to suppress evidence without conducting its own evidentiary hearings. *Id.* Thus, the Ninth Circuit found that the district court improperly conducted a "de novo" review. *Id.* Though the Ninth Circuit stated that a district court may "call for and receive additional evidence," the Ninth Circuit stated soon thereafter that the court is "not required to hear any witness and not required to hold a de novo hearing of the case." *Id.* at 617.

In this case, unlike *Remsing,* the Magistrate conducted extensive evidentiary hearings which were properly transcribed, and the Magistrate clearly explained his findings. The Court has conducted a thorough review of the testimony given at the evidentiary hearings and finds that no additional oral arguments are necessary. Therefore, the Court denies Petitioner's request for the Court to conduct its own evidentiary hearing.

### B. Impact of New Evidence on Jurors

■ One of Petitioner's primary objections to the SSRR is that when performing an analysis under *Schlup,* "it is not the district court's independent judgment as to whether reasonable doubt exists"; rather, the important inquiry is "whether 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Ma-*

*joy,* 296 F.3d at 777–78 (quoting *Schlup,* 513 U.S. at 329, 115 S.Ct. 851). At times, the Magistrate's analysis could arguably be interpreted as the Magistrate expressing his own "independent judgment." *See, e.g.,* SSRR, at 1095. In order to make the record clear, the Court will address these aspects of the SSRR and analyze how the evidence would impact reasonable jurors. Ultimately, the Court concludes that even in those instances where the Magistrate arguably could be interpreted as expressing his own independent judgment, the evidence is not of the nature that "no juror, acting reasonably, would have voted to find [Petitioner] guilty beyond a reasonable doubt." *Majoy,* 296 F.3d at 777–78.

Petitioner also relies heavily on *House v. Bell,* 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), to support his claim of actual innocence. As discussed at greater length below, however, *Bell* does not change the Court's conclusion that Petitioner does not qualify for the *Schlup* actual innocence gateway.

## III. DISCUSSION

First, it is important to understand the Court's duty on remand from the Ninth Circuit before addressing Petitioner's substantive objections. From there, the Court will address the credibility of recanting prosecution witness Michael Dominguez, Petitioner's other objections to the SSRR, and conclude with analyses of *Schlup v. Delo* and *House v. Bell.*

### A. Ninth Circuit Decision

The Ninth Circuit's opinion made clear that the ultimate question for the Court on remand is whether prosecution witness and accomplice Michael Dominguez's recantation is to be believed. In Petitioner's objection to the SSRR, Petitioner relies on the following language from the Ninth Circuit opinion:

[Other facts implicating Petitioner] include: (1) [Petitioner's] association with the thugs for hire; (2) [Petitioner's] writings that tend to identify the date and neighborhood of the murder; (3) his failed alibi; and (4) his receipt after the murders of $25,000 and some jewelry. Nevertheless, not one of these circumstantial facts—taken alone or in any combination—convinces us—should Dominguez's recantation and exculpatory evidence be determined to be reliable—that any rational juror would find them sufficient to convict [Petitioner] beyond a reasonable doubt.

*Majoy,* 296 F.3d at 777.

Petitioner insists that the Ninth Circuit found that "none of this evidence shows anything more than [Petitioner's] association with the Homicks and lack of good moral character." (Obj., at 23.) Petitioner fails to mention that in the above-quoted passage, the Ninth Circuit had assumed that Dominguez's recantation was credible. The Ninth Circuit made that assumption to guide the Court "*should* Dominguez's recantation and exculpatory evidence be determined to be reliable." *Majoy,* 296 F.3d at 777 (emphasis added). The Ninth Circuit noted that "at no time has an evidentiary hearing ever been held on the issue" and that it is up to "the skills of the district court" to determine the credibility of Dominguez's recantation. *Id.* at 777–78. Thus, contrary to Petitioner's assertions, the Magistrate did not find Petitioner's guilt based only on the "other evidence," but instead found Dominguez's recantation to be not credible. As a result, the "other evidence" mentioned by the Ninth Circuit served as corroboration for Dominguez's initial testimony and not as an independent basis for conviction.

The Ninth Circuit also stated that if Dominguez's recantation was found to be the "familiar, untrustworthy, and unreliable about-face by a self-interested crimi-

nal," then Petitioner's claim "will have failed." *Id.* at 776. Thus, to determine credibility, the Court must review Dominguez's recantation with a keen eye towards potentially self-interested motives.

### B. Credibility of Dominguez

 The Court's primary charge on remand from the Ninth Circuit is to determine whether Dominguez's recanted testimony is credible. It is proper for a district court to accept a magistrate's credibility determination of a witness. *United States v. Ridgway,* 300 F.3d 1153, 1156 (9th Cir.2002). Accepting a magistrate's credibility determination without conducting a de novo evidentiary hearing does not violate due process. *United States v. Raddatz,* 447 U.S. 667, 680, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

In *Raddatz,* the Supreme Court focused on the language in the Federal Magistrates Act, 28 U.S.C. § 636, which states that a district court must make a "de novo determination of those portions of the report . . . to which objection is made." *Id.* at 674, 100 S.Ct. 2406. The Court found that in order to make such a "determination," the district court need not conduct its own evidentiary hearing. *Id.* The Court said "[w]e find nothing in the legislative history of the statute to support the contention that the judge is required to rehear the contested testimony." *Id.* If, however, the district court were to reject the magistrate's findings, it would need to hold evidentiary hearings of its own. *Ridgway,* 300 F.3d at 1157–58.

The Court agrees with the Magistrate that there is no basis to find Dominguez's recantation credible. The Court has closely analyzed transcripts in this case including transcripts from Petitioner's trial and the 2004 evidentiary hearings before the Magistrate. The Court finds no need for a further evidentiary hearing to evaluate Dominguez's credibility. Because recant-

ed testimony is often the result of self-interested motivations, "[r]ecantation testimony is properly viewed with great suspicion." *Dobbert v. Wainwright,* 468 U.S. 1231, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari). Accordingly, the Court adopts the Magistrate's discussion about Dominguez's testimony and its ample inconsistencies.

In supplementing the Magistrate's findings, the Court writes to emphasize that, during the evidentiary hearings before the Magistrate, Dominguez almost exclusively based his recantation on his desire to get out of his plea deal. (*See* 10/5/04 ERT 92, 124, 134–35, 157; 3/10/04 ERT 265.) He rarely, if ever, said that he was recanting because Petitioner was actually innocent. Dominguez explicitly said at the evidentiary hearing that the "sole purpose" for writing the letter to Judge Cooper in September 1989, in which he disavowed his earlier statements, was for him to be "given the privilege of going to trial." (10/5/04 ERT 134.) When Dominguez was directly asked why he did not testify at Petitioner's trial, he responded: "The reason . . . is because my plea agreement was breached by the Los Angeles district attorney's office." (3/10/04 ERT 260.)

Dominguez repeatedly emphasized that the alleged breached plea deal was his reason for recanting:

> [T]he Los Angeles district attorney's office breached the plea agreement from start to finish . . . My plea called for the special circumstances to be stricken at sentencing, and they were not. I suffered a conviction for the special circumstances, and I was supposed to be given the privilege to choose any prison in America to do my sentence in. That was denied.

(3/10/04 ERT 265.)

Dominguez made it clear he wanted out of his plea deal so he could go to trial,

despite the fact that he would almost assuredly face a harsher sentence from a jury. In fact, Dominguez potentially faced the death penalty for his crimes. It is unclear whether Dominguez ever fully understood the harsher sentence he potentially faced by breaching his plea deal.[1] Indeed, it may never be possible to determine all of Dominguez's reasons for his recantation. What is clear, however, is that one of the central reasons for Dominguez's recantation was his substantial self-interested motivation to be released from his earlier plea agreement. The Magistrate's findings in this regard are amply supported by the record. In light of this self-interested motive, the Court agrees with the Magistrate that Dominguez's recantation is the "familiar, untrustworthy, and unreliable about-face by a self-interested criminal" mentioned by the Ninth Circuit. *See Majoy*, 296 F.3d at 776.

### 1. Confrontation Clause Issue

■ The Court acknowledges that the statute of limitations bars Petitioner from raising any claims on the merits unless he is found to have passed through the *Schlup* actual innocence gateway. Regardless of that fact, however, the Court wishes to address Petitioner's comments during the evidentiary hearing before the Magistrate to dispel any doubts as to potential Sixth Amendment violations.

During the evidentiary hearing before the Magistrate, Petitioner argued that the jury might have ruled differently had they been afforded the opportunity to see Dominguez testify in person.[2] (3/11/04 ERT

538.) Petitioner argued that the Supreme Court decision in *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), applied to this case because a witness's testimonial statement can be admissible at trial only if the defendant had a chance to confront and cross-examine the witness. (3/11/04 ERT 538–39.)

However, in 2007, the Supreme Court explicitly held that *Crawford* does not apply retroactively on collateral review. *Whorton v. Bockting*, 549 U.S. 406, 417, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). In *Whorton*, the Court found that because *Crawford* is a "new rule" under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), it can only be applied retroactively if it is a "watershed rule of criminal procedure" that implicates the "fundamental fairness ... of the criminal proceeding." *Id.* (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. 1060). The Court then explicitly held that *Crawford* was not a "watershed rule of criminal procedure," and therefore, could not be applied retroactively. *Id.*

In this case, Petitioner was convicted in 1990, well before *Crawford* was decided in 2004. Therefore, because Petitioner's conviction occurred 14 years before *Crawford* was decided, and because *Whorton* held that *Crawford* does not apply retroactively on collateral review, Petitioner cannot seek habeas relief from a *Crawford* Confrontation Clause violation.

> A: No, it didn't.
> Q: What did you think the penalty was for murder?
> A: I never thought about it.

---

**1.** During 3/11/04 (ERT at 454) cross-examination, the following exchange occurred after Dominguez agreed he was a suspect for murders in California and Nevada:

> Q: And you were aware both California and Nevada have the death penalty, were you not?
> A: I never thought of that, no.
> Q: It never occurred to you that they had the death penalty?

**2.** At Petitioner's trial, Dominguez refused to testify. The judge properly declared him unavailable and admitted his preliminary hearing testimony and recorded interviews with detectives into evidence.

■ Significantly, even if *Crawford* did apply retroactively, Petitioner had an opportunity—and in fact conducted—a cross-examination of Dominguez at the preliminary hearing. (3/11/04 ERT 539.) "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354. Here, Dominguez was unavailable and Petitioner had an opportunity to cross-examine his preliminary hearing testimony. Therefore, even if the statute of limitations did not bar Petitioner from bringing a Sixth Amendment claim, and even if *Crawford* applied retroactively, Petitioner's argument would still fail.

## C. Integrity of Detectives Holder and Crostley

Petitioner contends that Dominguez's recantation should be believed because Dominguez's initial testimony was the result of police coercion by the Detectives. In his objections, Petitioner claims that the SSRR not only failed to adequately consider the effect of the alleged police coercion on jurors, but goes so far as to "sanction[ ] egregious police misconduct." (Obj., at 16.) Specifically, Petitioner insists that the following evidence of Detective Holder's unethical character was not presented to the jury in Petitioner's case: (1) Detective Holder suborned perjury of a criminal informant (Siegel) at the first preliminary hearing for defendant Woodman; (2) the Detectives placed a photograph of Petitioner in front of Dominguez during the initial interview "so that [Dominguez] would identify [Petitioner] as the Ninja" (*Id.*); (3) Detective Holder called Deputy District Attorney John Krayniak a "wimp prosecutor" when Krayniak refused to put untruthful informant Sidney Storch on the witness stand (10/5/04 ERT 89); (4) the Detectives secretly entered into an undis-closed book rights agreement, presumably about the trial; and (5) after leaving the LAPD, Detective Holder obtained a court appointment as a phony expert witness or private investigator in the Woodman trial. (Obj., at 16.)

While Petitioner's evidence regarding the Detectives may speak to the negative qualities of Detectives Holder and Crostley, and perhaps even suggest that they used questionable interviewing tactics, this evidence does not alter the Court's conclusion with regard to the credibility of Dominguez's new testimony. This evidence regarding the Detectives does not allow Petitioner to meet the "extraordinary" burden of a *Schlup* claim for two reasons. First, the jury watched the interview between the Detectives and Dominguez at trial and, as a result, the jury was given the opportunity to evaluate whether Dominguez was coerced. This Court must examine "new reliable evidence" while evaluating a *Schlup* claim. 513 U.S. at 324, 115 S.Ct. 851 (emphasis added). Thus, because the placement of the photographs was presented to the jury at trial, Petitioner's objection standing alone would not cause a new jury to have reasonable doubts. Only Petitioner's "new" evidence—such as the book deal—could be used in connection with a *Schlup* claim. *Id.*

Second, even though Petitioner identifies some other evidence, because Dominguez himself is not credible, this evidence would not cause all reasonable jurors to doubt Petitioner's conviction. Had the Magistrate concluded that Dominguez was credible during the evidentiary hearings, the evidence of the Detectives' negative character may have supplemented the Magistrate's finding that Dominguez was credible. But given that the Magistrate found that Dominguez was not credible, the evidence of the Detectives' character

would not affect reasonable jurors viewing Dominguez's recantation.

For example, the fact that criminal informant Siegel perjured himself at the first preliminary hearing which caused the California Court of Appeals to overturn the hearing would not affect reasonable jurors as to Dominguez's recantation. Petitioner argues that it is not the perjured testimony itself that would affect reasonable jurors, but "Holder's subornation" of the perjury. (Obj., at 17.) As the Magistrate correctly pointed out, however, the trial court—not Detective Holder—permitted Siegel to lie under oath about his past as an FBI informant at the first preliminary hearing. (SSRR at 1092.) Although the decision to allow Siegel to testify falsely was based on Detective Holder's unsworn assertion that Siegel faced bodily harm if his true identity were exposed, it was the trial court that ultimately allowed the false testimony to proceed. *See Woodman v. Superior Court*, 246 Cal.Rptr. 42, 45–47 (1988). Significantly, although Siegel did lie at the first preliminary hearing, that testimony was never introduced at Petitioner's trial and could not have affected all reasonable jurors.

A similar analysis is applicable to Petitioner's remaining claims regarding the Detectives. Each claim is about the character of the Detectives, which cannot affect Dominguez's recantation unless Dominguez is found credible. First, Detective Holder's "wimp prosecutor" comment has no bearing on Dominguez's testimony or any coercion of Dominguez; second, the Detectives' book agreement by itself does not lead to the conclusion that they coerced Dominguez's testimony;[3] and finally, Detective Holder's subsequent job as a "phony" expert witness in the Woodman trial occurred after Petitioner's trial and, as a result, could not affect Domin-

guez's initial testimony or recanted testimony. Because each of the aforementioned instances have no direct bearing on Dominguez's testimony, and because Dominguez's recantation is not credible, reasonable jurors would not doubt Petitioner's conviction based on the Detectives' character, even when viewed in the aggregate.

## D. Robyn Lewis's Testimony

Robyn Lewis, who worked as a receptionist for the Woodmans' business, Manchester Products, provided testimony that linked Petitioner to Neil Woodman at Petitioner's trial. Later, at the 1994 Woodman brothers' trial, Ms. Lewis's testimony was impeached by her boss who claimed that Ms. Lewis could not have met Petitioner at Manchester Products. Petitioner objects to the Magistrate's conclusion that Ms. Lewis's testimony was credible despite the impeachment. (Obj., at 19.) As an initial matter, Petitioner might be correct that the SSRR could be interpreted as making a credibility determination of Ms. Lewis's testimony instead of leaving such a determination to the province of the jury. The jury would be free to accept or reject Ms. Lewis's testimony in light of the impeachment.

Any challenge based on Ms. Lewis's testimony, however, like the evidence of the Detectives' character, does not convince the Court that reasonable jurors would doubt the validity of Petitioner's conviction. The California Court of Appeal decision, with which the Court generally agrees, conducted a thorough exposition of the evidence supporting Petitioner's conviction. An analysis of that decision reveals that Ms. Lewis's testimony was a small part of the overall evidence and of

---

**3.** This is especially true since the Detectives did not agree to the book deal until after

most—if not all—of the investigation had completed.

relatively little importance to Petitioner's conviction. To quote the Court of Appeal:

> [T]he evidence is sufficient to support a verdict that [Petitioner] participated in a conspiracy to commit a violent offense, and in fact that the offense was murder. Apart from the previously discussed evidence concerning Michael Dominguez, there was ample evidence linking [Petitioner] with the Homicks and the planning and execution of the murders. [Petitioner's] own address book contained the telephone number for Manchester Products and notations about the victims' address. Additional evidence showed [Petitioner] had met with Neil Woodman several weeks before the murders took place. Ample evidence established the existence of an ongoing relationship with the Homicks, including the daily reminders of Steven Homick which were replete with references to [Petitioner.] ... [Petitioner's] own admissions established his knowledge that the Homicks were involved in a surveillance of people who they intended to seriously injure or kill ... Significantly ... [Petitioner] received a substantial amount of money after the commission of the murders ... Such evidence provided an additional strong link of [Petitioner] to the conspiracy and murders.

*People v. Majoy*, No. B052619, 39–40 (Cal. Ct.App. Jan. 27, 1997).

Clearly, the Court of Appeal did not rely heavily on Lewis' testimony. The Court agrees with the Court of Appeal that whether Ms. Lewis's testimony was credible is not especially important to Petitioner's conviction. Even if Ms. Lewis was found to be not credible at Petitioner's trial, however, this lack of credibility would not raise sufficient doubt in the minds of reasonable jurors to meet the *Schlup* standard in light of the other substantial evidence implicating Petitioner. And, although Ms. Lewis's testimony provided a link between Petitioner and the Woodmans, such a link was not necessary for the conviction. The Woodmans hired the Homicks to commit the murders, and the Homicks in turn hired Dominguez and Petitioner to help execute the plan. There was no need for a personal relationship between Petitioner and the Woodmans. Therefore, not all reasonable jurors would be affected by Ms. Lewis's impeached testimony such that Petitioner could pass through the *Schlup* gateway.

### E. Roger Backman's Testimony

On the night of the murders, Roger Backman witnessed a blackclad "Ninja" outside the murder scene. The prosecutors used this information to claim that Petitioner was the Ninja. At Neil Woodman's 1994 trial, however, Mr. Backman described the Ninja in such a way "arguably as not only to exclude the middle-aged [Petitioner,] but to implicate the youthful Dominguez."[4] *Majoy*, 296 F.3d at 774.

In the SSRR, the Magistrate stated that even if Petitioner was not the Ninja, "Mr. Backman ... heard another individual running through the bushes. Thus, Mr. Backman's description of the 'Ninja' does not support a finding that petitioner was not a participant in the murders." (SSRR at 1095.) Petitioner objects to the Magistrate's finding that Petitioner could have been a "noise in the bushes." (Obj., at 20.) Though the Court agrees with the Magistrate's analysis of Mr. Backman's testimony, the SSRR could arguably be interpreted as applying the incorrect standard of review by reaching what could be con-

---

4. Mr. Backman testified that he identified Dominguez as the Ninja because it was the "most logical[ ]" choice based on Dominguez's age, skin tone, and build. *Majoy*, 296 F.3d at 775.

strued as a factual conclusion. This Court will therefore determine de novo how Mr. Backman's testimony would affect reasonable jurors. *See Majoy*, 296 F.3d at 776.

Although Mr. Backman's 1994 testimony might support Petitioner's actual innocence claim, the Court concludes that this evidence would not have such an effect on reasonable jurors such that Petitioner would meet the *Schlup* burden. First, as with Ms. Lewis's testimony, the California Court of Appeal did not give Mr. Backman's testimony much weight. The Court of Appeal decision thoroughly analyzed the evidence, and the Court generally agrees with the Court of Appeal's analysis. After listing the substantial corroborating evidence implicating Petitioner, the Court of Appeal stated: "Finally, independent corroboration [by Backman], no matter how slight in value it might appear to be when standing alone, implicated [Petitioner] in the conspiracy and murders." *People v. Majoy*, No. B052619, 38 (Cal.Ct.App. Jan. 27, 1997). As the Court of Appeal decision illustrates, Petitioner's conviction was based on ample corroborating evidence, which included Mr. Backman's testimony, even though Mr. Backman's testimony was of "slight" value. Because Mr. Backman's testimony was of such slight value, this evidence would not have swayed reasonable jurors to such an extent to satisfy the *Schlup* actual innocence standard.

Second, in discussing Mr. Backman's 1994 testimony, the Ninth Circuit stated that "Backman identified . . . the 'Ninja' in such a way *arguably* as . . . to exclude the middle-aged [Petitioner]." *Majoy*, 296 F.3d at 774 (emphasis added). Though Mr. Backman's statements "arguably" excluded Petitioner as the Ninja, there was nothing conclusive about his testimony at the subsequent trials. Mr. Backman admitted he only saw a small part of the Ninja's face "between . . . just above [the Ninja's] eyebrows and just below the tip of the nose" and that he therefore could not conclusively identify the man. *Majoy*, 296 F.3d at 775. Mr. Backman's qualified statements would not cause all reasonable jurors to doubt Petitioner's conviction.

Even assuming Mr. Backman conclusively exonerated Petitioner as the Ninja, without something more, such as substantial evidence of police coercion or clear reliability of Dominguez's recantation—both of which are lacking—Petitioner cannot reach the standard that "no reasonable juror would have found [P]etitioner guilty beyond a reasonable doubt." *Majoy*, 296 F.3d at 776.

Because the Court generally agrees with the California Court of Appeal that Mr. Backman's identification of the Ninja was of little import in upholding Petitioner's conviction, and because Mr. Backman did not conclusively exonerate Petitioner as the Ninja, Petitioner has failed to meet the heavy burden of a *Schlup* actual innocence claim.

### F. Supreme Court Precedent

The Supreme Court has found that an otherwise procedurally barred habeas petition could proceed on the basis of "actual innocence" in only two cases: *Schlup v. Delo* and *House v. Bell.* A brief analysis of these two Supreme Court cases illustrate that Petitioner's case falls significantly short of satisfying the exception.

#### 1. *Schlup v. Delo*

In *Schlup*, the petitioner, a white man imprisoned in Missouri, was convicted of murder along with two other white defendants for killing a black inmate at Missouri State Penitentiary. 513 U.S. 298, 301, 115 S.Ct. 851 (1995). At the petitioner's trial, the state relied principally on the testimony of two corrections officers who witnessed the murders to connect the petitioner to the murders. *Id.* at 302, 115

S.Ct. 851. The state did not provide any physical evidence implicating the petitioner and no other witnesses other than the officers testified to his involvement in the murder. *Id.* By comparison, the other two defendants were much more easily implicated—defendant Stewart was apprehended at the crime scene and defendant O'Neal's clothes were covered with blood from lacerations on his hands. *Id.* at 302 n. 2, 115 S.Ct. 851.

In order to substantiate his claim of actual innocence, the petitioner presented evidence of a video that was captured by a camera in the prison's dining call. The video showed the petitioner as the first inmate to enter the dining hall and that he walked through and got his food. *Id.* at 303, 115 S.Ct. 851. Just over a minute after the petitioner entered the dining room, several guards ran out of the room in response to an apparent distress call. *Id.* O'Neal then burst into the dining hall twenty-six seconds later covered in blood. *Id.*

The petitioner used the videotape in conjunction with several affidavits given by fellow prisoners and filed his habeas petition in federal court.[5] The petition was procedurally barred, however, because the petitioner failed to raise his new claims in a timely fashion. *Id.* at 309, 115 S.Ct. 851. Despite the procedural bar, the Supreme Court held that the petitioner's new evidence—several eyewitnesses with no motive to lie, testimony regarding the aftermath of the murder, and the videotape—was enough to meet the extraordinary threshold of actual innocence. *Id.* at 331, 115 S.Ct. 851.

Comparing the facts of *Schlup* with the present case, it is evident that Petitioner

has not reached the threshold necessary to pass through the actual innocence gateway. First, unlike *Schlup*, in which the petitioner obtained several post-trial eyewitness accounts from inmates who had not previously testified, Petitioner has only one witness's recanted testimony and another witness's inconclusive testimony to support his claim of actual innocence. The eyewitnesses in *Schlup*, such as Lamont Griffin Bey, explicitly exonerated the petitioner, unlike Dominguez who rarely if ever said Petitioner was "actually innocent" in his recantation.

More importantly, the witnesses in *Schlup* had no motive to exculpate the petitioner, especially given the racial tensions in the prison. In this case, however, Dominguez has a self-interested motive given his desire to get out of his plea deal. In *Schlup*, the credibility of the inmates' affidavits followed logically from the lack of motivation to lie, whereas here Dominguez's recantation lacks credibility due to his self-interested motivations.

Finally, in *Schlup*, the petitioner's involvement in the crime was highly implausible because two other men were easily implicated. As Schlup strolled into the dining hall, not sweaty or out of breath, defendant O'Neal burst through the doors covered in blood. By contrast, here there is corroborating evidence implicating Petitioner in the crimes, such as the $25,000 deposited in Petitioner's account after the murders. There is little evidence to exonerate Petitioner besides Dominguez's incredible recantation.

*Schlup* was a case where substantial evidence pointed to the petitioner's non-involvement in the crime. Several eyewit-

---

5. For example, inmate Lamont Griffin Bey, a black inmate, testified as to Schlup's absence from the crime scene with the qualifying statement, "When this happened, there was a lot of racial tension in the prison. . . . I would

not stick my neck out to help a white person under these circumstances normally, but I am willing to testify because I know Lloyd Schlup is innocent." Affidavit of Lamont Griffin Bey, pp. 2–3 (Apr. 7, 1993).

ness affidavits from rival black inmates, videotaped evidence, and officers' testimony all pointed to a miscarriage of justice should the petitioner have been executed. The present case simply does not meet the *Schlup* standard, especially considering the unreliability of Dominguez's recantation.

### 2. *House v. Bell*

*House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), is also distinguishable from the present case because of the amount of credible post-trial evidence weighing in favor of the petitioner's actual innocence claim, which included forensic DNA evidence. In *House*, the petitioner was sentenced to death for the murder of Carolyn Muncey in Tennessee in 1985. *Id.* at 523, 126 S.Ct. 2064. Ms. Muncey's dead body was found in the woods near her house, bruised and bloodied with semen on her gown. *Id.* at 525, 126 S.Ct. 2064. On the night of the murder, the petitioner was seen driving around near the crime scene. *Id.* At that time he stopped to talk to the man who found Ms. Muncey's body, claiming he too was looking for the body. *Id.* When the petitioner went in to give a statement to police, he falsely claimed that he spent the night of the murder with his girlfriend. *Id.* at 526, 126 S.Ct. 2064. The petitioner's girlfriend initially corroborated his alibi, but then stated that the petitioner had actually left her trailer at some point that night and had later come back shirtless, sweaty, and panting. *Id.* at 527, 126 S.Ct. 2064. The petitioner was on probation for a previous sexual assault conviction. *Id.* at 526, 126 S.Ct. 2064. He had scratches on his arms and hands which he attributed to his girlfriend's cat and a bruised right ring finger which he said was due to recent construction work. *Id.* at 527, 126 S.Ct. 2064. Law enforcement of-

ficials seized the pants the petitioner wore on the night of the murder and sent them to the FBI along with Ms. Muncey's blood samples and other evidence. *Id.* at 528, 126 S.Ct. 2064. After a serologist testified that the semen on Ms. Muncey's gown had come from a " 'secretor,' " [6] the petitioner was arrested and subsequently convicted of capital murder. *Id.* A blood expert further stated that it was impossible for the blood on the petitioner's pants to have come from the petitioner and must have come from Ms. Muncey. *Id.*

To establish a motive, the prosecution relied heavily on the semen stain found on Ms. Muncey's gown:

> The evidence at the scene which seemed to suggest that he was subjecting this lady to some kind of indignity, why would you get a lady out of her house, late at night, in her night clothes, under the trick that her husband has had a wreck down by the creek? ... Well, it is because either you don't want her to tell what indignities you have subjected her to, or she is unwilling and fights against you, against being subjected to those indignities. In other words, it is either to keep her from telling what you have done to her, or it is that you are trying to get her to do something that she nor any mother on that road would want to do with [the petitioner], under those conditions, and you kill her because of her resistance. That is what the evidence at the scene suggests about motive.

*Id.* at 531–32, 126 S.Ct. 2064.

Following the petitioner's conviction, new DNA studies cast doubt on the petitioner's guilty verdict. First, a post-trial DNA study proved that the semen found on Ms. Muncey's gown was that of Mr. Muncey, and not the petitioner. *Id.* at

**6.** "Secretor" means "someone who 'secrete[s] the ABO blood group substances in other body fluids, such as semen and saliva'—a

characteristic shared by 80 percent of the population, including [the petitioner].' " *Id.* at 529, 126 S.Ct. 2064.

540, 126 S.Ct. 2064. Second, the bloodstains found on the petitioner's pants were conclusively determined to not have come from Ms. Muncey at the murder scene, but rather from vials of Ms. Muncey's post-autopsy blood being transported with the pants. *Id.* at 542, 126 S.Ct. 2064. Both the evidence about the semen and the blood was not revealed until the habeas proceedings. *Id.*

The Supreme Court held that a new jury would give this new forensic (and thus credible) evidence "great weight." *Id.* at 541, 126 S.Ct. 2064. The Court noted that the petitioner's sex-driven motivation for the murder was eliminated because the semen on Ms. Muncey's gown was not his. *Id.* Thus, reasonable jurors would have doubts as to the petitioner's guilt. *Id.*

Yet, despite the strong forensic evidence pointing to the petitioner's innocence, the Supreme Court said his *Schlup* claim would still fail without something "more" than the forensic evidence. *Id.* at 548, 126 S.Ct. 2064. The petitioner, however, did produce something "more"—post-trial testimony from two women, Kathy Parker and Penny Letner, who both said Mr. Muncey had admitted to the murder while intoxicated. *Id.* at 548–49, 126 S.Ct. 2064. Letner, who was 19 and had a small child at the time of the murder, said she was too scared to testify against Mr. Muncey at trial. *Id.* at 550, 126 S.Ct. 2064. Parker said she tried to explain what she knew to the sheriff's department before trial but no one listened. *Id.* There were no clear motivations for the women to lie, and, in fact, their testimony was consistent with other evidence adduced at the habeas proceedings, which suggested Mr. Muncey was not where he said he was on the night of the murder. *See id.* at 550–52, 126 S.Ct. 2064.

In granting the petitioner's *Schlup* claim, the Supreme Court said that despite the evidence weighing in favor of inno-cence, the case was "close" because of the high threshold for actual innocence claims. *Id.* at 554, 126 S.Ct. 2064.

Contrasting the facts of *House* with the present case reveals that Petitioner's claim falls far short of the *Schlup* threshold. Unlike *House*, Petitioner produced zero forensic evidence exculpating himself from the crime. The petitioner in *House* had evidence proving that the semen found on Ms. Muncey's gown was not his and that the blood on his pants did not come from the crime scene. In contrast, Petitioner presented no concrete evidence pointing to his innocence. Furthermore, the primary motivation for the petitioner in *House* to kill Ms. Muncey—to cover up a sexual assault—was eliminated by the DNA evidence, while Dominguez's recant-ed testimony does not overcome the fact that Petitioner was paid $25,000 as potential motivation for his part in the crime.

Moreover, unlike *House*, in which post-trial witnesses Parker and Letner had no motivation to lie about their new testimony, Dominguez had a self-interested moti-vation in recanting his preliminary hearing testimony in order to get out of his plea deal. Also unlike *House*, in which Parker and Letner both explicitly exonerated the petitioner by pointing to a plausible alter-nate actor in Mr. Muncey, Dominguez based his recantation primarily on his de-sire to escape his plea deal and never pointed to an alternate explanation.

Despite factual distinction between *House* and the present case, Petitioner also relies on *House* for the proposition that a *Schlup* claim does not require "ab-solute certainty about the petitioner's guilt or innocence" to succeed. *House*, 547 U.S. at 538, 126 S.Ct. 2064. Petitioner argues that the Supreme Court allowed the peti-tioner in *House* to pass through the gate-way despite acknowledging that other evi-dence at the habeas evidentiary hearing "cuts in favor of the State" and noted that

the district court did not find the petitioner to be a credible witness. *Id.* at 553, 126 S.Ct. 2064. Petitioner quotes the following passage from *House:*

> This is not a case of conclusive exoneration. Some aspects of the State's evidence ... still support an inference of guilt. Yet the central forensic proof connecting [the petitioner] to the crime—the blood and semen—has been called into question, and [the petitioner] has put forward substantial evidence pointing to a different suspect.

*Id.* at 553–54, 126 S.Ct. 2064 (emphasis added).

However, the above discussion shows that the Supreme Court found ample evidence that was both new and credible to allow the petitioner to pass through the actual innocence gateway. The Supreme Court may have found some evidence that still "cut[ ] in favor of the State," but it clearly found more evidence cutting in favor of the petitioner's innocence. Such is not the case here. Comparing the facts of the two cases clarifies that Petitioner simply did not present enough evidence to meet the *Schlup* actual innocence threshold, especially considering the lack of credibility in Dominguez's recantation.

## IV. CONCLUSION

The Court has thoroughly examined the record as part of its de novo review and agrees with the Magistrate's ultimate decision to deny Petitioner's habeas petition as procedurally barred. Viewed in totality, Petitioner simply does not muster enough evidence to succeed on a *Schlup* actual innocence claim.

Though the Ninth Circuit stated that Petitioner's evidence, on its face, raises a "possibility that ... [Petitioner] may be able to muster a plausible factual case" to meet the *Schlup* actual innocence standard, a close analysis reveals that much of the evidence is flawed. *Majoy*, 296 F.3d at 775. Specifically, Robyn Lewis's testimony was largely irrelevant to connect Petitioner to the conspiracy and murders; the Detectives' conduct had no bearing on the jury and much of their conduct occurred post-trial; Roger Backman could not conclusively prove Petitioner was not the Ninja; and, most importantly, Dominguez's recantation lacked credibility. Because the Ninth Circuit remanded to this Court to determine the credibility of Dominguez's recantation, and because this Court has determined it was not credible, Petitioner's *Schlup* claim must fail Accordingly, the Court adopts the Magistrate's SSRR.

IT IS SO ORDERED.

## SECOND SUPERSEDING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JEFFREY W. JOHNSON, United States Magistrate Judge.

This Superseding Report and Recommendation is submitted to the Honorable Stephen V. Wilson, United States District Judge, by United States Magistrate Judge Jeffrey W. Johnson, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the instant Petition for Writ of Habeas Corpus be dismissed with prejudice as barred by the statute of limitations.[1]

1. This Second Superseding Report and Recommendation addresses Petitioner's objection that the Court failed to consider recent Supreme Court authority. *See* fn. 6, below. No additional changes have been made to the Report, except the instant explanatory footnote. While petitioner will, as a matter of course, be afforded a further period for objections, nothing in this Second Superseding Report and Recommendation is substantively

## I. PROCEDURAL SUMMARY

On August 25, 1998, petitioner Anthony Joseph Majoy, a state prisoner proceeding *pro se,* filed in this Court a "Petition for Writ of Habeas Corpus by a Person in State Custody (28 U.S.C. § 2254)" (hereinafter "Petition"). The Petition challenged a 1990 conviction in the Los Angeles County Superior Court for one count of conspiracy to commit murder for financial gain and two counts of first degree murder for financial gain while lying in wait. (Petition, p. 4.) Petitioner was sentenced to imprisonment for life without the possibility of parole. (*Id.*)

Petitioner appealed to the California Court of Appeal and simultaneously sought state habeas relief in the California Court of Appeal. On January 27, 1994, the Court of Appeal issued an unpublished opinion affirming Petitioner's convictions, modifying his sentence, and denying his petition for writ of habeas corpus. (*Id.* at 5, 8.) Petitioner then filed in the California Supreme Court a petition for review of the California Court of Appeal's decisions affirming his conviction and denying habeas relief. The California Supreme Court denied the petition on May 12, 1994. (*Id.* at 6.) On April 15, 1997, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court. (Answer, 19 Exh. D.) On August 27, 1997, the Supreme Court denied the petition on 20 procedural grounds. (*Id.* at Exh. E).

Petitioner then sought habeas relief in this Court. On October 28, 1998, respondent filed an Answer to the Petition, arguing that the Petition should be dismissed, in part, because it was barred by the one-year statute of limitations period afforded by the Anti–Terrorism and Effective Death Penalty Act (hereinafter "AED-

PA"). (*Id.* at 6–9.) On December 14, 1998, petitioner filed a 26 Traverse, claiming that the Petition met several exceptions to the AEDPA's statute of limitations. On May 24, 2000, this Court issued a Report and Recommendation that the Petition be dismissed as untimely. On August 10, 2000, judgment was entered dismissing the Petition.

Petitioner timely appealed to the Ninth Circuit Court of Appeals. On July 11, 2002, the Ninth Circuit reversed the judgment of the district court and remanded for further proceedings. Although the appellate court concluded the Petition had been untimely filed, *Majoy v. Roe,* 296 F.3d 770, 772 (9th Cir.2002), the court found that petitioner "may be able to muster a plausible factual case meeting the exacting [actual innocence] standard established by the Supreme Court in *Schlup* [*v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ] for overriding a petitioner's clear failure to meet deadlines and requirements for filing a timely petition in federal court." *Majoy,* 296 F.3d at 775. Thus, the district court was charged with determining whether petitioner meets the *Schlup* standard and, if so, whether an actual innocence exception to the AEDPA's statute of limitations exists. *Id.* at 776–77.

On March 9, 10, and 11, and October 5, 6, 7, and 8, 2004, this Court conducted an evidentiary hearing in compliance with the Ninth Circuit's mandate.

## II. STATEMENT OF FACTS

In 1983, brothers Neil and Stewart Woodman hired hitmen Steven and Robert Homick (also brothers) to murder the Woodmans' parents. (Resp. Exh. 107, pp. 21–23, 26–27, 36–49, 63–64.)[2] The crime

different from the First Superseding Report and Recommendation.

2. Unless otherwise specified, all citations to exhibits refer to those introduced by the parties at the evidentiary hearing.

was to take place on the night of September 25, 1985, Yom Kippur. (Resp. Exh. 100, pp. 60, 100, 102–03.) The Woodman's motive was to gain an advantage in a family business dispute (Resp. Exh. 107, pp. 15–21) and to collect on their mother's $500,000 insurance policy-money they needed to pay off business debts (*Id.* at 15–18).

Late in the evening of September 25, 1985, the Woodman parents were shot and lolled in the parking garage of their Brentwood apartment complex. Roger Backman, an independent witness, saw a black-clad individual, later referred to as the "Ninja," fleeing the scene of the crime.[3] The California Court of Appeal described Backman's testimony as follows:

> Between 10:00 and 11:00 p.m., Roger Backman was visiting his mother in the apartment building next door to where the Woodmans lived. He heard five gunshots: two in rapid succession followed by a pause, and then three more in quick succession. Mr. Backman ran out to the balcony area. He looked down to the walkway which ran between the buildings. He then heard noises in some bushes which sounded like someone coming in his direction and someone else running in the opposite direction.
>
> Mr. Backman next saw a person come out of the bushes from the next building, and run along bushes which were next to a brick wall. The person came over the top of the wall and landed on the walkway of Mr. Backman's mother s building. Mr. Backman still heard other rustling noises in the bushes, moving in the direction of the street, suggesting to him that someone else was going in that direction.
>
> When the man jumped the wall, Mr. Backman yelled down to him. The man

stopped for a few seconds in a crouched position, and looked up. Mr. Backman could observe that the man was dressed in black from head to toe, including a black hood. Mr. Backman observed that the hood had eye openings and was secured around the neck. He did not believe that it was a sweatshirt-type hood. For the two or three seconds Mr. Backman observed the man, all he could see were the eyes. Before the man took off running north in the alley, Mr. Backman looked at the person's hands, out did not see any gun.

(Answer, Exh. A, pp. 24–25.)

Petitioner was arrested for the murders in March 1986, but was soon released. (Resp. Exh. 100, p. 9.) He was rearrested in April 1986. (Resp. Exhs. 100, 102.)

At petitioner's trial, the prosecution argued that petitioner was the "Ninja" observed by Robert Backman. (59 RT 16793.) This theory was supported by statements from accomplice Michael Dominguez. Dominguez originally told police that petitioner had associated with the Homick brothers and that Dominguez thought he observed petitioner in Robert Homick's car on the day of the murders. (Pet. Exh. 11, pp. 44, 46–47, 50, 58, 61.) Dominguez, in exchange for a lesser sentence and a representation that he was "not the shooter," testified to this effect at petitioner's second preliminary hearing. (43 RT 12070, 12073, 12085, 12103–04, 12106.) However, Dominguez refused to testify at petitioner's trial. (41 RT 11473, 11484–97, 11504–06, 11530–32.) As a consequence, the trial judge determined that Dominguez was "unavailable" as a witness; thus, his preliminary hearing testimony and portions of a videotaped interview Dominguez had with police were introduced in evidence at petitioner's trial.

---

**3.** The assailant was termed the "Ninja" after Mr. Backman described the suspect as wearing a black hooded outfit.

The California Court of Appeal treated Backman's testimony as independent corroboration of Dominguez's statements inculpating petitioner, stating:

Finally, independent corroboration, no matter how slight in value it might appear to be when standing alone, implicated appellant in the conspiracy and murders. Dominguez described appellant as wearing a black-hooded sweatshirt on the night of the murders. Roger Backman testified that the figure who ran from where the Woodmans had been murdered was wearing a black hood, although he did not describe it as a sweatshirt.

(Answer, Exh. A, p. 62.)

After petitioner's conviction, Stewart Woodman confessed his guilt in exchange for a promise that the prosecution would not seek the death penalty against him. (Resp. Exh. 107.) Stewart said that Steven Homick had told him who was at the crime scene, but Stewart did not name petitioner. (*Id.* at pp. 94–95; 103 RT 11777.) Petitioner presented this new evidence to the trial court in a motion for a new trial. The California Court of Appeal affirmed the denial of petitioner's request for a new trial on the grounds that the evidence was hearsay and did not, by omission of his name, exonerate the petitioner. *California v. Majoy*, No. B052619, slip op. at 61 (Cal.Ct.App. Jan. 27, 1997).

### III. STANDARD OF REVIEW

In *Schlup v. Delo*, the Supreme Court identified two types of claims pertaining to actual innocence that might be made after trial. First, the Court considered the substantive claim of actual innocence, as asserted in *Herrera v. Collins*, 506 U.S. 390,

113 S.Ct. 853, 122 L.Ed.2d 203 (1993), that execution of an innocent person violates the Eighth Amendment even if a conviction was the product of a fair trial. *Schlup*, 513 U.S. 298, 313–15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Second, the Court recognized the procedural claim of actual innocence, asserted by *Schlup*, that conviction of an innocent person is constitutionally impermissible when the conviction was the product of an unfair trial.[4] *Id.* at 314, 316, 115 S.Ct. 851.

In cases involving procedural claims of actual innocence, a petitioner's constitutional claims are subject to procedural bars (e.g., statute of limitations, second or successive petition) and therefore, a federal court cannot address the merit s of those claims unless the petitioner can show that his case falls within the "narrow class of cases . . . implicating a fundamental miscarriage of justice." *Id.* at 314–15, 115 S.Ct. 851 (citing *McCleskey v. Zant*, 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)). A claim of innocence is " 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merit s.' " *Id.* at 315, 115 S.Ct. 851 (*Herrera v. Collins*, 506 U.S. at 404, 113 S.Ct. 853). To pass through the gateway and argue the merit s of his underlying claims, a petitioner must present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error. *Id.* at 316, 115 S.Ct. 851.

In *Schlup*, the Court explained that since procedural claims of actual innocence accompany a claim of innocence with an assertion of constitutional error, such

---

4. Petitioner Schlup's constitutional claims were based not on his innocence, but rather on the contention that "the ineffectiveness of his counsel, and the withholding of evidence by the prosecution, denied him the full panoply of protections afforded to 28 criminal defendants by the Constitution." *Schlup*, 513 U.S. at 314, 115 S.Ct. 851.

convictions "may not be entitled to the same degree of respect as one ... [involving a substantive claim of actual innocence], that is the product of an error free trial." *Id.* Consequently, evidence of innocence in procedural claims need carry less of a burden.[5] *Id.* To demonstrate a procedural claim of actual innocence, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327, 115 S.Ct. 851. As the Supreme Court explained,

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Id.* at 324, 115 S.Ct. 851.[6] "The Court bears in mind that in order to pass through the gateway, a movant's case must be 'truly extraordinary.'" *United States*

v. *Zuno–Arce,* 25 F.Supp.2d 1087, 1102 (C.D.Cal.1998) (citing *Schlup v. Delo,* 513 U.S. at 327, 115 S.Ct. 851).

## IV. DISCUSSION

As explained above, the Ninth Circuit found that petitioner "may be able to muster a plausible factual case meeting the exacting [procedural actual innocence] standard established by the Supreme Court in *Schlup* for overriding a petitioner's clear failure to meet deadlines and requirements for filing a timely petition in federal court." *Majoy,* 296 F.3d at 775. The Ninth Circuit charged this Court to determine (1) whether petitioner meets the *Schlup* standard,[7] and (2) if he meets the standard, whether an actual innocence exception to the AEDPA's statute of limitations exists. *Id.* at 776–77. Since this Court concludes that petitioner has not met the *Schlup* standard of proving a procedural claim of actual innocence, it does not reach the issue of whether actual innocence provides a gateway through which courts may review the merit s of an untimely petition.[8]

---

**5.** The Court in *Schlup* explained that "[i]n *Herrera* (on the assumption that petitioner's claim was, in principle, legally well founded), the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" *even* if his conviction was the product of a fair trial. For *Schlup,* the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be miscarriage of justice *unless* his conviction was the product of a fair trial." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851.

**6.** In his Objections to the Superseding Report and Recommendation, Petitioner argues that the Court failed to consider the intervening Supreme Court authority of *House v. Bell,* 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In fact, the Court did 28 consider this authority and it is entirely consistent with the Supreme Court's earlier decision in *Schlup. House* requires no change in the Court's analysis of Petitioner's claims.

**7.** Petitioner argued, *inter alia,* that the following "new evidence" supported his procedural claim of actual innocence: Michael Dominguez, a key prosecution witness, recanted his testimony implicating petitioner; the police investigation involved 23 questionable methods; the testimony of Robyn Lewis was impeached; and the testimony of Roger Backman likely excludes petitioner as the "Ninja." (Proposed Findings, pp. 18–47.)

**8.** Although this Court does not decide whether there exists an actual innocence exception to the statute of limitations, it notes the Ninth Circuit's implication that a showing of actual innocence pursuant to the United States Supreme Court's decision in *Schlup v. Delo,* has "the consequence of overriding AEDPA's one-year statute of limitation." *Majoy v. Roe,* 296 F.3d 770, 776–77 (9th Cir.2002) (citing *Triestman v. United States,* 124 F.3d 361, 378–79 (2d Cir.1997) (observing in dicta that the procedural denial under AEDPA of collateral review to a party claiming actual innocence

## A. Testimony of Michael Dominguez

The crux of petitioner's innocence argument is that Michael Dominguez, a key prosecution witness, recanted his testimony implicating petitioner.[9] As he must, petitioner concedes that Dominguez is not a credible witness, but nevertheless petitioner contends that Dominguez's recantation is credible. (Proposed Findings, pp. 4–5.) Respondent argues that Dominguez's recantation is unreliable and is therefore insufficient to satisfy the *Schlup* test. (Respondent's Proposed Findings, pp. 82–87.)

### 1. *Dominguez's Police Interview*

In early March 1986, the Las Vegas Metropolitan Police arrested Michael Dominguez. (Res. Exh. 118.) On March 13, 1986, Dominguez was interviewed by the members of the Los Angeles Police Department ("LAPD"), the Las Vegas Metropolitan Police Department, and the Las Vegas office of the Federal Bureau of Investigation; the interview was videotaped. (Res. Exh. 145, pp. 1–46.) Before Dominguez spoke with police, his attorney, Steven Stein, stated that "[t]here have been no agreements made between Michael and myself and members of the Los Angeles Police Department, other than an understanding that if Michael is fully cooperative, tells the truth and testifies on behalf of the People of the State of California in this matter, that the two officers who are present will go to bat for him in California and try to get him as good a deal as they possibly can, ah, in a court of law in California." (Res. Exh. 145, pp. 2–3.) Dominguez indicated that he understood the terms as stated by his attorney. (*Id.* at p. 3.)

Dominguez discussed the Woodman murders in detail with the police and implicated petitioner in a number of ways. First, Dominguez stated the Homick brothers had talked to petitioner on the phone while the Homicks and Dominguez were conducting "surveillance" on the Woodman residence. (Pet. Exh. 11, pp. 21–22, 24.) Dominguez recalled that during this conversation, Steve Homick stated that "there was a lot of money in this and that we can't miss." (*Id.* at 40, 47.) Dominguez also told the police that he "thought" he saw petitioner in Robert Homick's car on the day of the murders and that he "believed" petitioner and Robert Homick got into Steve Homick's car after Dominguez had been dropped off at a bus bench to act as the lookout. (*Id.* at 44, 46–47, 50, 58, 61.) Dominguez stated that on the day of the murders, petitioner was

could raise serious constitutional problems); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) (noting that if AEDPA's statute of limitation prevented a petitioner who is actually innocent from filing a first federal habeas petition, AEDPA's limitation period would "raise [] serious constitutional questions and possibly render [] the habeas remedy inadequate and ineffective"); *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir.1997) (observing that "[w]ere no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent ... we would be faced with a thorny constitutional issue"); *United States v. Zuno–Arce*, 25 F.Supp.2d 1087, 1102 (C.D.Cal.1998), *aff'd on other grounds*, 209 F.3d 1095 (9th Cir.2000) ("[T]o foreclose a claim of constitutional violation where there has been a colorable showing of factual innocence would likely constitute a due process violation or an improper suspension of habeas corpus relief"); *Alexander v. Keane*, 991 F.Supp. 329, 334–39 (S.D.N.Y. 1998)).

9. The alleged recantation of Michael Dominguez also appears to have been a primary basis for the Ninth Circuit's remand. *See Majoy v. Roe*, 296 F.3d at 776 ("[I]f Dominguez's recantation is the familiar, untrustworthy, and unreliable about-face by a self-interested criminal, as argued by the Respondent and echoed by the California Court of Appeal in denying Majoy's petition for a writ of habeas corpus, then Majoy's petition will have failed.") (footnote omitted).

wearing a black jogging suit with a hood. (*Id.* at 75.)

### 2. *Dominguez's Testimony at the First Preliminary Hearing* [10]

Michael Dominguez testified against petitioner at petitioner's first preliminary hearing; this testimony was read to the jury at petitioner's trial. (43 RT 12141–54.) Dominguez testified at length regarding the details of the murder. Specifically, Dominguez testified that while he and Steve Homick were "surveilling" the Woodman residence, Robert Homick notified Steve via radio that Robert had been in a traffic accident. (43 RT 12143.) Upon receiving this information, Steve and Dominguez traveled to Robert's location. (43 RT 12144.) Dominguez testified that he then witnessed petitioner inside Robert's car, although Dominguez did not get a clear look at petitioner's face. (43 RT 12147, 12146, 12153.) Dominguez stated that petitioner was wearing a black hooded sweatshirt. (43 RT 12154.)

### 3. *Dominguez's Testimony at the Second Preliminary Hearing*

Michael Dominguez also testified at petitioner's second preliminary hearing; this testimony was also read to the jury at petitioner's trial. (43 RT 11958–12106–10.) Dominguez again detailed his own involvement in the murders. With regard to petitioner, Dominguez testified that he met petitioner briefly before the murders when Steve and Robert Homick brought Dominguez to petitioner's house. (43 RT 12070, 12103–04.) Dominguez also reiterated his prior testimony that he had observed petitioner in Robert Homick's car after Robert was involved in a traffic accident on the day of the murders; petitioner was wearing a black hooded sweatshirt. (43 RT 12073, 12085, 12106–5.) Dominguez clarified, however, that before the accident he had not seen petitioner in Robert's car. (43 RT 12088.) Dominguez testified that he did not see Robert's car again after leaving the accident scene. (43 RT 12090, 12098.)

### 4. *Dominguez's Letters*

On September 1, 1989, before petitioner's conviction, Dominguez wrote a letter to Los Angeles County Superior Court Judge Candace Cooper. In that letter, Dominguez expressed both his dissatisfaction with attorney Charles Lloyd, Dominguez's counsel at the time of petitioner's trial, and Dominguez's belief that Mr. Lloyd had conspired against Mr. Dominguez and intentionally misrepresented him. (Res. Exh. 117, pp. 1–2.) Dominguez also expressed concern for his own safety in prison and requested that he not be returned to the control of Los Angeles detectives for safety reasons. (Res. Exh. 117, p. 3.)

On July 29, 1991, after petitioner's conviction, Dominguez wrote a letter to Los Angeles County Superior Court Judge Alexander Williams. (Res. Exh. 118.) For the first time, Dominguez alleged that his confessions and statements to police were the result of police coercion. (Res. Exh. 118, p. 1.) Dominguez wrote, in relevant part: "Sonny Majoy—name came about by compulsion + more and more of numerous coerced talk from Jack Holder. Later down the road Jack said—Yes it was Sony [sic] Majoy. He Sony admitted it when they picked him up—to some old cop

---

**10.** The California Court of Appeal overturned the first preliminary hearing and ordered that a second preliminary hearing be conducted after finding that the trial court knowingly allowed a state witness Stewart Siegel to testify falsely. *Woodman v. Superior Court,* 246 Cal.Rptr. 42 (1998), *review denied and opinion ordered not published by,* (July 28, 1988) (No. S005709).

friend that new Sony most of Sony's life chasing Sony or something to this effect [sic]." (*Id.* at p. 2.)

On September 15, 2003, Dominguez wrote a letter to Los Angeles County Superior Court Judge Sandy Kriegler. (Pet. Exh. 76.) Dominguez alleged that Deputy District Attorney Pat Dixon, who prosecuted petitioner's case, "directed a fundamental miscarriage of justice conviction against Anthony Majoy." (Pet. Exh. 76, p. 1094.) Dominguez asserted that Pat Dixon had coerced the trial judge into finding Dominguez unavailable as a witness and allowing the prosecution to rely on Dominguez's preliminary hearing testimony. (*Id.*) Dominguez wrote that "[Dominguez] lied and committed perjury." (*Id.* at p. 1095.)

### 5. *Dominguez's Testimony at the Second Trial* [11]

During the trial of Neil Woodman and the Homick brothers (the "Second Trial"), Dominguez testified that he had lied repeatedly to the police and in the transcripts used to convict petitioner. (Homick RT 8928, 8933, 8937, 8944, 8951.)

### 6. *Dominguez's Testimony at the Habeas Evidentiary Hearing*

At the evidentiary hearing before this Court, Dominguez testified that he first met petitioner in early September 1985 at petitioner's residence. (3/9/04 ERT 126.) On September 24, 1985, Steve Homick informed Dominguez that they were traveling to California to carry out a robbery. (3/9/04 ERT 130.) Upon arrival in Los Angeles, Dominguez and Steve went to Robert Homick's residence, and from there began conducting "surveillance" in the Brentwood area. (3/9/04 ERT 135–36.)

The surveillance continued the next day— September 25, 1985. (3/9/04 ERT 148.) During this surveillance, Steve informed Dominguez that Dominguez would be placed on a bus bench near the Woodman residence (3/9/04 ERT 153) and "would be looking for a man in a two-door Mercedes–Benz that drives fast." (3/9/04 ERT 144, 154.) Also during the surveillance, Steve asked Dominguez to ring the doorbell corresponding to the Woodman name at the Woodman's apartment complex. (3/9/04 ERT 146, 150–51.)

Throughout the surveillance, Dominguez had seen Robert Homick drive by in his car ten to twenty times. (3/9/04 ERT 165.) However, Dominguez did not observe anyone else in the car with Robert until Dominguez and Steve met Robert at the scene of his traffic accident. (3/9/04 ERT 167.) Dominguez testified that he later identified the other individual in Robert's car as petitioner. (3/9/04 ERT 168.) After sitting on the bus bench for a period of time, Dominguez radioed to Steve that he had seen the Mercedez–Benz drive past; approximately two minutes after Dominguez saw the vehicle, Steve picked him up from the bus bench. (3/9/04 ERT 156.) Dominguez and Steve did not discuss what had happened, and Dominguez did not see Robert again that night. (3/9/04 ERT 156–57, 158–59.)

Dominguez further testified that "going back at that time that specific time, ... [he] couldn't identify who was in the vehicle" with Robert Homick. (3/9/04 ERT 168.) Dominguez explained that when he and Steve arrived at the accident scene, Dominguez stayed in the car. (3/9/04 ERT 172.) It was from this vantage point,

---

**11.** Petitioner and Stewart Woodman were tried together in April 1989 in the "First Trial." (Petitioner's Pre–Evidentiary Hearing Brief, p. 8.) In October 1992, Neil Woodman and the Homick brothers stood trial in the

"Second Trial." (*Id.* at 9.) The second trial resulted in a hung jury on the charges against Neil Woodman. (*Id.* at 9.) Thus, in November 1995, Neil Woodman was tried again in the "Third Trial." (*Id.*)

Dominguez testified, that he saw another individual in Robert Homick's car, and he saw his face "[b]riefly and vaguely." (3/9/04 ERT 172.) The individual in Robert's car "looked like this and ducked down." (3/9/04 ERT 172.) Dominguez testified that he "could not identify [the individual in Robert Homick's car]" (3/9/04 ERT 173); (10/5/04 ERT 147), and asserted unequivocally that the individual he saw in Robert's vehicle after the traffic accident was absolutely not petitioner (3/10/04 ERT 255). However, on cross-examination, Dominguez testified that his testimony at the second preliminary hearing that "the man named Sonny, who was in the car with Jessie [Robert] Homick, was wearing a black hooded sweatshirt," was truthful testimony. (3/11/04 ERT 380.)

Dominguez then explained that he originally named petitioner because Dominguez had met petitioner in California and "everything, revolved around California." (3/10/04 ERT 224, 230.) He further explained that before his interview with police he was informed by his attorney that petitioner was a suspect in a triple murder in Las Vegas. (3/10/04 ERT 224–25.) Dominguez testified that he believed the police implied to him that petitioner was involved in the Woodman murder by placing a picture of petitioner in front of Dominguez during the interview. (3/10/04 ERT 225.) Dominguez explained that his statement that he saw petitioner and Robert get into Steve's car was "all an error" and his reference to the two men "jump[ing] in with Steve" referred to meeting at Robert's car after his accident. (3/10/04 ERT 237–38, 240–41.) Dominguez further explained that when he told police that petitioner was wearing a black hooded sweatshirt, he was merely "walking behind the words" of the detective in referring to the "unidentified person in the vehicle with Mr. Homick as [petitioner]." (3/10/04 ERT 250.)

When questioned about his statement that the Homicks had called petitioner on the day of the murder, Dominguez testified that he believed the brothers "probably could call no one else but [petitioner]." (3/10/05 ERT 229.)

Dominguez acknowledged that at the second preliminary hearing he positively identified petitioner as being in Robert Homick's car and described petitioner as wearing a black hooded sweatshirt. (3/10/04 ERT 267.) Dominguez testified at the evidentiary hearing that this identification was a lie. (3/10/04 ERT 267.) He explained that he changed his equivocal identification of petitioner at the first preliminary hearing to an unequivocal identification at the second preliminary hearing in response to a change in his security status within the Los Angeles County jail. (3/10/04 ERT 302.)

Dominguez insisted that he did not testify at petitioner's trial because he did not want to lie and breach his plea agreement. (3/11/04 ERT 406, 510.) Dominguez also offered that he did not testify at petitioner's trial because his plea agreement had been breached by the Los Angeles District Attorney's Office. (3/10/04 ERT 260.) Specifically, he testified that the special circumstances were not stricken from his conviction and that he was denied the privilege to choose any prison in America to serve his sentence, both of which, he testified, had been promised to him by the District Attorney's Office. (3/10/04 ERT 265.) Dominguez claimed that another reason he refused to testify against petitioner was he "thought [petitioner] would be exonerated on the case." (3/10/04 ERT 312.) Dominguez also asserted that he had changed his testimony in response to his concerns for his own safety within the county jail. (3/10/04 ERT 304.)

Dominguez emphasized that he "was on a leash for the Los Angeles District Attor-

ney's Office. And they [the District Attorney's Office] were using [petitioner] as a crutch, making me use [petitioner] as a crutch in order to uphold my safety concerns in the L.A. County Jail." (3/10/04 ERT 306, 319–20.) Dominguez explained that Detectives Holder and Crotsley of the Los Angeles Police Department threatened that if Dominguez "ruin[ed] this for the Los Angeles District Attorney's Office, then thereafter [Dominguez] go [sic] out to the main line-general population." (3/10/04 ERT 307.) Dominguez asserted that the detectives offered Dominguez an assurance of safety in exchange for Dominguez's identification of petitioner as the individual in Robert Homick's vehicle. (3/10/04 ERT 320.)

Dominguez said that he had been threatened several times while in custody. Specifically, he alleged having been threatened with a knife by a guard in Los Angeles County Jail. (3/11/04 ERT 520–21.) He also alleged that a federal prosecutor in Las Vegas had told lies about Dominguez's cases and threatened to have Dominguez lolled. (3/11/04 ERT 517–19.) Dominguez testified that after giving his changed testimony at the second preliminary hearing, his housing situation changed for the better. (3/10/04 ERT 308–09.)

Dominguez also recalled that Deputy District Attorneys Pat Dixon and John Krayniak told Dominguez that his plea agreement would not be withdrawn and in Dominguez's mind this intransigence gave Dominguez "a free avenue to commit perjury in the L.A. proceedings by the district attorney's office." (3/10/04 ERT 308, 311, 318; 10/5/04 ERT 34, 132–33.)

Dominguez repeatedly emphasized that he wanted to withdraw his plea and proceed to trial on the murder charges. (3/11/04 ERT 509–10; 10/5/04 ERT 92, 124, 131, 134–35.) He noted that he had written a number of letters to Los Angeles Superior Court judges in his attempt to withdraw his plea. (10/5/04 ERT 133.) Specifically, Dominguez reiterated that the "sole purpose" of writing a letter to Judge Cooper was to be "given the privilege of going to trial." (10/5/04 ERT 134.) Dominguez acknowledged that some of his statements in the letters to the Superior Court Judges were lies. (3/11/04 ERT 403.)

Dominguez testified that his statements to police about seeing petitioner and Robert Homick get into Steve Homick's car after Dominguez had been dropped off at the bus bench were in error. (3/11/04 ERT 429.) Dominguez urged that when he told police that petitioner was the individual seen in Robert's car, Dominguez was "just guessing." (3/11/04 ERT 439, 446.) He further clarified that he never saw petitioner on the day of the murders. (3/11/04 ERT 460.)

During the break in proceedings from March 11, 2004 to October 5, 2004, this Court received a letter from Michael Dominguez indicating that he would not be continuing his testimony at the evidentiary hearing. (10/5/04 ERT 5–6.) Despite his threat not to testify, Dominguez, after consulting with his attorney, continued his testimony on October 5, 2004. (10/5/04 ERT 30.)

Before resuming his testimony on October 5, 2004, Dominguez informed the Court that he had a matter which he needed to address. Dominguez informed the Court that he had been "subjected to a national security and bugged." (10/5/04 ERT 27–28.) Dominguez explained that he had "nanotechnology injected under the surface of the skin" and thus requested a "medical MRI." (10/5/04 ERT 28.) Dominguez further opined that he had "a national security embedded mobile phone implanted underneath the skin of the body, nanotechnology." (10/5/04 ERT 28.) According to Dominguez, the "nanotechnology"

was placed under his skin by the Federal Bureau of Investigation and the California Department of Corrections for the purpose of monitoring "your thoughts, your visual thoughts, communications visually and verbally, communication to and from the body via cellular transmission." (10/5/04 ERT 28.) The Court noted that a previously ordered psychiatric evaluation concluded that Dominguez was competent to testify at the evidentiary hearing, and directed Dominguez to proceed with his testimony. (10/5/04 ERT 28–29.)

Dominguez recalled that in 1998 a fellow prison inmate filed a habeas petition in the Los Angeles County Superior Court on Dominguez's behalf. (10/5/04 ERT 30, 33–34.) Dominguez noted that the petition contained a number of lies. (10/5/04 ERT 34, 93.) Dominguez highlighted his own declaration which had been attached to the state petition, and which he signed under penalty of perjury. (10/5/04 ERT 93–94.) In the declaration, Dominguez asserted that Assistant District Attorney John Krayniak, the original prosecutor, had made a secret deal with Dominguez to "discharge [Dominguez] of the conviction" if he continued to assist the prosecution in convicting "all of the defendants"; Dominguez testified that this was a lie. (10/5/04 ERT 97–98.) Dominguez conceded that in the declaration he lied about a "letter from Krayniak. That never came from Krayniak." (10/5/04 ERT 96.) About this letter, Dominguez testified that he included with his declaration a "memorandum" dated April 12, 1988 and allegedly signed by Mr. Krayniak. (10/5/04 ERT 98.) Dominguez admitted that the memorandum had not been given to him by Mr. Krayniak, but rather by Neil Woodman. (10/5/04 ERT 98.) Dominguez countered that Neil Woodman had tricked Dominguez into writing Mr. Krayniak's name and that Neil Woodman then used Dominguez's writing to sign the memorandum. (10/5/04 ERT 99–100.)

He further theorized that had he testified at petitioner's trial, his testimony would have been consistent with his inability to place petitioner in Robert Homick's vehicle. (10/5/04 ERT 151.) He also asserted his belief that the district attorney had fabricated and falsified evidence against petitioner. (10/5/04 ERT 156.)

Dominguez reiterated that he did not want to testify at petitioner's trial because he "wanted to go to my own trial." (10/5/04 ERT 157.) Although Dominguez admitted that testifying at petitioner's trial would not have prevented him from proceeding to trial himself, he insisted that "it made a lot [of] difference to me." (10/5/04 ERT 157–58.)

Dominguez reiterated unequivocally that he did not shoot Gerald and Vera Woodman. (10/5/04 ERT 168.)

### 7. *Analysis*

Michael Dominguez is not at all credible. Even setting aside his "inventive" ramblings, much of Dominguez's more rational testimony at the evidentiary hearing was inconsistent. For example, Dominguez said that Deputy District Attorney Krayniak gave him a "free avenue to commit perjury" (3/10/04 ERT 308), but later testified that Mr. Krayniak did not give Dominguez a license to perjure himself (3/10/04 ERT 311; 3/11/04 512–13). Dominguez emphasized that he "could not identify [the individual in Robert Homick's car]" (3/9/04 ERT 173), but on cross-examination testified that his testimony at the second preliminary hearing that "the man named Sonny, who was in the car with Jessie Homick, was wearing a black hooded sweatshirt," was truthful (3/11/04 ERT 380). In addition, Dominguez opined that the Homick brothers had called an individual on the phone that could not have been anyone other than petitioner, but also testified that the individual on the phone was "Ortega" who the Homicks had called in

regard to an inoperable radio. (3/10/04 ERT 228–229). Finally, Dominguez stated that he did not testify at petitioner's trial because he did not want to lie and breach his plea agreement. (3/11/04 ERT 406, 510.) However, he later contradicted this assertion by claiming he had not testified at petitioner's trial because his plea agreement had already been breached by the Los Angeles District Attorney's Office. (3/10/04 ERT 260.)

Dominguez made more than one attempt to suspend his testimony via invocation of his Fifth Amendment rights, despite his having been informed on several occasions that he could not selectively invoke his Fifth Amendment privilege. (10/5/04 ERT 5–6, 110–11, 112–13.) Moreover, Dominguez admitted that he had repeatedly lied under oath, in court documents, and in letters he personally wrote to superior court judges. (10/5/04 ERT 34, 93–94, 96, 166.) When asked why he felt obligated to tell the truth at the evidentiary hearing but not in any of the state court proceedings, Dominguez stated only that it was important to tell the truth in federal court because "as far as I know, there hasn't been no falsification of evidence in federal court." (10/5/04 ERT 166.)

Dominguez's demeanor while on the stand before this Court demands a rejection of his testimony as a whole. This Court found Dominguez to be evasive (3/9/04 ERT 128; 3/10/04 ERT 228–29, 233–34, 247–48, 3/11/04 ERT 365–66, 370, 407–08, 435–36, 438–39, 454, 495–97, 506; 10/5/04 ERT 34, 94), uncooperative (3/11/04 ERT 371, 463, 505–06; 10/5/04 ERT 30, 95–96, 105, 106), delusional (3/11/04 ERT 404–05, 517–21; 10/5/04 ERT 27–28), and bewildered (3/11/04 ERT 359–60, 362, 465–66, 490–93, 501, 507, 513–14, 516; 10/5/04 ERT 109–10; 10/5/04 ERT 113–14, 115, 157–58).

Petitioner concedes "that Dominguez is not a credible *person*" (Pet. Proposed Findings, p. 5), but nevertheless urges the Court to find that his recantation is credible. This the Court cannot do. While the truthfulness of Dominguez's statements to police and preliminary hearing testimony is questionable at best, the credibility of those statements was an issue left to the province of the jury. The unreliability of Dominguez's evidentiary hearing testimony leaves this Court with no reason or basis to override the jury's credibility determination and find that petitioner has proven his procedural claim of actual innocence.

The record reflects that Dominguez has a plausible, self-interested motive for recantation. While the Court may never know the true motivation behind Dominguez's changed testimony, it is undisputed that Dominguez has for years attempted to withdraw his plea. (10/5/04 ERT 92, 124, 131, 134–35, 155, 157.) Significantly, Dominguez was informed by the trial court at the time of his plea that his plea agreement could be deemed void if it were determined that he had lied during the prosecution of this case. (Res. Exh. 116, pp. 9–10.) Thus, petitioner correctly observes that if Dominguez were allowed to withdraw his guilty plea, he could potentially be charged with capital murder and face the death penalty. (Res. Exh. 116, p. 4.)

Nevertheless, Dominguez's inconsistent testimony, affinity for dishonesty, apparent mental health issues, and evasive demeanor wholly undermine the Court's ability to use his testimony as a basis for finding that petitioner has passed through the "gateway" necessary to have his otherwise barred constitutional claims considered on the merit s. In sum, Michael Dominguez's in-court behavior and apochryphal and inconsistent testimony preclude this Court from crediting any of his statements as true. The Ninth Circuit perhaps said it best when it suggested that Dominguez's

recantation might be nothing more than "the familiar, untrustworthy, and unreliable about-face by a self-interested criminal." *Majoy v. Roe,* 296 F.3d at 776. Thus, Dominguez's recantation is not evidence of petitioner's innocence "so strong that [this] [C]ourt cannot have confidence in his conviction." *Schlup v. Delo,* 513 U.S. at 316, 115 S.Ct. 851.

Nevertheless, even if this Court could credit Dominguez's testimony, petitioner has still not satisfied his burden of proving his procedural claim of actual innocence under *Schlup.* Throughout Dominguez's "recantation," he never denied that petitioner was involved. Dominguez merely stated that his identification of petitioner as the individual inside Robert Homick's vehicle was not true. Even assuming that Dominguez's recantation is truthful and that petitioner was not the individual inside Robert's vehicle, petitioner has still failed to meet the requisite standard— Dominguez's recantation does not affect the state of the remaining evidence of petitioner's guilt of the murders of Gerald and Vera Woodman, as well as a conspiracy to commit those murders.

The Ninth Circuit advised that petitioner's belief that the Homicks intended to harm someone accompanied by the fact that "he lifted not one finger nor spoke one word to derail their plot . . . without more is not sufficient to convict anyone of a crime." *Majoy v. Roe,* 296 F.3d at 777. However, this Court finds that there is much "more" factual evidence of petitioner's involvement. Not only did petitioner know of the Homicks' sinister intentions and refuse to derail the plot, petitioner, by his own admission, proactively assisted the Homicks. Specifically, petitioner located

and used two pay phones close to his house for private communications between him and Steve Homick (Resp. Exh. 100, 32–33, Exh. 102, pp. 23–24, 25), communicated with Steve in secret code (Resp. Exh. 102, 26), and looked up the date of Yom Kippur 1985 because two people Steve had under surveillance would be at a restaurant or synagogue on that date (Resp. Exh. 100, pp. 101, 102–03). In addition, petitioner had looked up the Woodman's zip code in Brentwood and circled it in his phonebook (Resp. Exh. 100, 3, 78; Exh. 101, p. 2); he had written an address in his phonebook which was significantly similar to the victims' address [12] (Resp. Exh. 101, p. 1). Further, petitioner had the phone number for Manchester Products, the business owned by the Woodman brothers, in his address book (34 RT 9571–72) and was seen by Robyn Lewis visiting Neil Woodman at Manchester Products.[13]

Petitioner had a motive for participating in the killings as he needed money to start a video tape business. Shortly after the murders, petitioner received $25,000 from the Homicks as an investment in petitioner's fledgling business. (Resp. Exh. 100, pp. 81, 82, 86.) Importantly, petitioner has never established his whereabouts on the night of the murder. Petitioner stated only that he must have been bowling. However, the records from his league revealed that petitioner did not attend league activities on the night of September 25, 1985. (48 RT 13672–81, 13698–13704, 13706–07.)

Finally, although the testimony of Roger Backman appears to exclude petitioner as the assailant who came eye to eye with Mr. Backman,[14] the witness also testified to hearing a second individual running

---

**12.** Petitioner wrote in his phonebook "Gouiam 11949 # 209." (Resp. Exh. 101, p. 1.) The victims' address was 11939 Gorham, # 203. (RT 7654, 7662.)

**13.** As explained below, this Court finds Robyn Lewis' testimony to be wholly credible.

**14.** Backman's testimony came when defense counsel showed Backman People's Exhibit

through the bushes of the apartment complex. Given the state of the evidence, it would be quite plausible, for a reasonable jury to conclude that petitioner was that unidentified individual.

## B. Integrity of Investigating Officers

Petitioner argues that his claim of innocence is supported by evidence of a dishonest police investigation. He contends that the detectives had a conflict of interest resulting from a book rights agreement entered into before the start of petitioner's trial. (Proposed Findings, pp. 38–40.)

Both Detectives verified the existence of the book deal (10/6/04 ERT 74; 10/7/04 ERT 51), but insisted that the deal did not alter their handling of the case (10/6/04 96; 10/7/04 ERT 52–53). Detective Holder denied that the book agreement violated LAPD policy and did not believe it to be inappropriate. (10/6/04 ERT 74, 95.) Detective Holder remembered being paid $500 for the book deal, but testified that he received no further compensation. (10/6/04 ERT 129–31.)

There is no indication that the "book deal" caused the detectives to handle their investigation of the Woodman murders differently. From the apparent pre-trial timing of the book deal in relation to the overall murder investigation, it appears that most of the investigation had been completed by the time the detectives entered into the book agreement. The evidence of the book deal simply does not meet the standard necessary to demonstrate a procedural claim of actual innocence: namely, that it is more likely than not that no reasonable juror would have convicted petitioner in light of this evidence. There is no evidence, nor does petitioner argue, that the detectives fabricated or falsified evidence against petitioner in relation to a proposed book agreement. In addition, there is no evidence that the book deal led the detectives to testify falsely against petitioner at trial.

No. 2, a series of photographs with a photograph of petitioner, marked as "E," and a photograph of Dominguez, marked as "F." The questioning went as follows:

Q [By Defense Counsel]: When you reviewed these series of photographs in the past, it was your—you would agree that the person marked in F [Dominguez] is the one that most closely resembled the person that you saw down in the walkway on the night in question?
A [By Backman]: The most logically, Yes, would be F.
Q: Well, you say "most logically." You're basing that on color of skin?
A: Yes .... That was my best logical conclusion that-of that particular type build and particular olive type skin. That's why I best logically picked this particular photograph.
Q: So the person in F [Dominguez] has the same colored olive skin that you saw on the person on the night in question?
A: Yes.
Q: This person has the same build as the person in the walkway?
A: He appears to have the same build, Yes.

Q: Do the eyes also appear to be the same?
A: Yeah. They appear to be somewhat the same, Yes.
. . .
Q: Now, the only part that you saw on the night in question was the part between my fingers just above his eyebrows and just below the tip of the nose?
A: Correct.
Q: And that's the very same description that you gave to the police officers right there and then when they came out a few minutes after you made these observations; Isn't it?
A: Yes.
Q: Olive tone skin, the person was Hispanic or Asian?
A: Yes.
Q: Five foot eight to five nine?
A: Yes.
Q: A hundred and sixty pounds, athletic?
A: Yes.
Q: And he was about twenty-five years old?
A: Roughly, give or take. I believe I may have mentioned somewhere in his twenties.

Next, petitioner claims that the police investigation should be questioned because both Detectives Holder and Crotsley would have used the questionable testimony of informant Sidney Storch. (Proposed findings, pp. 40–42.) Detective Holder informed Deputy District Attorney Krayniak, that professional informant Sidney Storch had offered to testify to overhearing a confession by Stewart Woodman. Detective Crotsley remembered interviewing Storch and testified at the evidentiary hearing that he believed Storch should have been used as a witness. (10/7/04 ERT 49.) After determining that Storch's account was likely untruthful, Mr. Krayniak chose not to call Storch as a witness. At the evidentiary hearing, Mr. Krayniak testified that Detective Holder called him a "wimp prosecutor" in response to his decision not to use Storch's testimony. (10/6/04 ERT 75–76.)

Critically, this evidence of alleged police misconduct would not, in this court's assessment, render more likely than not that no juror having that evidence would vote to convict petitioner. Storch had offered to testify about an alleged confession made by Stewart Woodman. There is no evidence that Storch intended to testify regarding petitioner's involvement in the crime. Nor is there any indication that Storch falsified any information about petitioner. There is no evidence that the Detectives knew whether or not Storch was telling the truth; and their willingness to offer his testimony so that a fact finder could pass on the issue of his credibility does not impact in any way the issue of petitioner's innocence to the extent that this Court confidence in petitioner's conviction would be undermined. *Schlup v. Delo*, 513 U.S. at 316, 115 S.Ct. 851.

Petitioner also relies on the fact that the first preliminary hearing was thrown out by the California Court of Appeal due to the use of false testimony by informant Stewart Siegel. (Proposed Findings, pp. 42–43.) At an ex parte, in camera hearing before Los Angeles Superior Court Judge Sandy Kriegler, Detective Holder gave an unsworn assertion that Siegel had safety concerns within the Los Angeles County Jail after being revealed as a long time informant. This information persuaded the court to permit Siegel to lie under oath at the first preliminary hearing. The decision to allow Siegel to testify falsely was made by the trial court.[15] Although the

---

15. On April 28, 1986, the trial court magistrate conducted an in camera, ex parte hearing on several discovery matters. In addition to the magistrate, the prosecutor and Detective Jack Holder were present. Sworn testimony was given by Siegel, a purported informant. Siegel testified, *inter alia*, that, starting in the late 1970's until 1983, he had an ongoing relationship with the FBI as a paid secret informant. He testified that the disclosure of his career as a paid informant for the FBI would place him at great personal risk. Siegel's alleged safety concerns were supported only by unsworn statements from the prosecutor and Detective Holder. The magistrate ultimately denied the defendants' request for discovery relating to Siegel's history as an informant. The magistrate then ordered the transcript of the hearing sealed.

Siegel was later called by the prosecution to testify at the defendants' preliminary hearing; Siegel offered damaging testimony against the defendants. However, Siegel disclosed only portions of his history as an informant. Moreover, the magistrate restricted the cross-examination of Siegel with regard to his background as an informant, purportedly due to Siegel's safety concerns. This left unchallenged the distinct impression created on direct examination that Siegel's career as an informant started in 1985.

On November 14, 1986, the trial judge found that Siegel had given fabricated testimony at the preliminary hearing, but that this finding provided no basis to set aside the information. On April 12, 1988, the California Court of Appeal directed that the trial court order the information be set aside as a result of Siegel's fabricated testimony. *Wood-*

trial court's decision was based on Detective Holder's assertion that Siegel was experiencing safety concerns, there is no evidence that Detective Holder instigated Siegel's false testimony in an attempt falsely to convict petitioner. Importantly, although Siegel did lie under oath at the first preliminary hearing, this testimony was not introduced at petitioner's trial and could not have influenced the verdict.

In addition, petitioner argues that the Detectives used suggestive interview techniques. Specifically, petitioner complains that the Detectives improperly used a suggestive six pack photospread wherein the relevant suspect was always placed in position number two. (Proposed Findings, pp. 43–44.) Petitioner also asserts that the interrogation of Dominguez was suggestive because Detectives placed petitioner's photograph in front of Dominguez during the entire interview, petitioner was in the number two position, and Dominguez was repeatedly asked if the person in photograph number two was the person Dominguez saw in Robert Homick's car.[16] (Proposed Findings, p. 44.) However, petitioner provides no evidence that Dominguez was actually influenced by this technique, or that Dominguez falsely identified petitioner as a result of these interview techniques. Petitioner's contention does not constitute new evidence sufficient to prove petitioner's procedural claims of actual innocence.

Petitioner also argues that the detectives coerced witnesses Robyn Lewis, Norma Drinkern, and Bette Saul, among others, to give false testimony. (P's Brief, pp. 32–39.) As discussed below, this Court credits the testimony of Robyn Lewis, and

finds it was not the product of police coercion. Although register receipts call into question witness Norma Drinkern's testimony that she sold bolt cutters to Robert Homick and Michael Dominguez, there is no evidence that Ms. Drinkern fabricated testimony as a result of police coercion. Most important, Ms. Drinkern's testimony has little to do with petitioner's procedural claims of actual innocence.

Petitioner also argues that witness Bette Saul's testimony resulted from police coercion. (*Id.* at 37–38.) Saul testified at petitioner's trial that she saw Robert Homick standing by his car near the Fine Affair restaurant in Bel Air on the afternoon of the murders. She stated that Homick was with another man whom she could only describe as being six feet tall. (37 RT 10210, 10226–27.) At the Second Trial (the trial of Neil Woodman and the Homick brothers), after undergoing three interviews by Detective Holder, Saul testified that the man she saw with Robert Homick was a "5 foot 6 inch white haired older man with a slender build." (93 RT 9944.) Finally, at the Third Trial (re-trial of Neil Woodman), Saul testified that she "might have" seen a second person. (5 RT 2184.)

Although the evolution of Saul's testimony arouses suspicion, the implication of fabrication or tampering seems to apply only to Saul's testimony at the second and third trials. Saul's testimony at petitioner's trial, the First Trial, exculpates petitioner as petitioner does not fit Saul's description of a six foot tall individual.

Petitioner further argues that the testimony of airline passengers who identified

---

man v. Superior Court, 246 Cal.Rptr. 42 (1988), review denied and opinion ordered not published by, (July 28, 1988) (No. S005709).

**16.** Petitioner further notes that during the interrogation, Dominguez was shown a picture of an individual named Lou Cordileon.

Cordileon's picture was in the number three position; when Dominguez stated that "Louie" carried the bolt cutters, Detective Holder stated that "Louie wasn't even there." Dominguez replied, "I mean, eh, number two, Sonny." (*Id.* at 44.)

Steve Homick and Michael Dominguez as being on their flight from Las Vegas to Burbank is inherently unreliable because "such eyewitness identification is not within the realm of the humanly possible." (P's Brief, p. 38.) Petitioner's subjective claim that "such eyewitness identification is not within the realm of the humanly possible" is neither evidence that this testimony was the result of police coercion nor a compelling argument.

Petitioner complains that Dominguez was threatened by police, as allegedly evidenced by the fact that Detective Garcia can be seen on videotape "flicking" his kubaton, a small baton-shaped martial arts weapon. (*Id.* at 44–45.) Specifically, during a videotaped travel tour of the murder scene, Dominguez can be seen in the presence of several LAPD Detectives. At one point in the video, Detective Garcia appears to be aimlessly "flicking" his kubaton while positioned a significant distance behind Dominguez. This evidence does not prove in any way that Dominguez was threatened by police. The specific portion of the video in which Detective Garcia can be seen "flicking" the kubaton illustrates that Dominguez was likely not even aware of Detective Garcia's behavior, as Dominguez was walking well in front of the Detective at the time.

Finally, the appointment and payment of Detective Holder as an "expert witness" is troubling. However, Detective Holder served, as an expert witness only in the third trial, that of Neil Woodman. The Third Trial took place long after petitioner's conviction; thus, no misconduct during that Third Trial could have impacted petitioner's conviction. This evidence simply does not meet the standard required to place petitioner's case within the "narrow class of cases . . . implicating a fundamental miscarriage of justice." *Schlup*, 513 U.S. at 314–15, 115 S.Ct. 851.

Indeed, none of the evidence presented by petitioner meets the threshold required for this Court to hear his barred constitutional claims. He has not asserted that the jury was presented with evidence fabricated by the detectives. Petitioner has also failed to show what effect, if any, inappropriate conduct by the detectives had on the trial.

## C. Robyn Lewis

Petitioner's procedural actual innocence claim also rests in small part on the alleged impeachment of prosecution witness Robyn Lewis. At the time of the murders, Robyn Lewis was the receptionist at Manchester Products. (RT 8708–09.) Ms. Lewis' testimony affirmatively connected petitioner to the Woodman brothers. Petitioner bases his argument on Lewis' testimony at the federal RICO trial involving the same defendants. At that trial, Neil Woodman's attorney stated at side bar that Lewis had fabricated the story because during her initial interview she did not mention petitioner or identify him in a lineup. (Federal RT 191.) Petitioner also argues that the state conceded Ms. Lewis' unreliability by choosing not to call her as a witness in the subsequent trials of petitioner's accomplices.[17]

### 1. *Lewis' interview with Detective Holder*

In a March 19, 1986 tape-recorded interview with Detective Holder, Ms. Lewis identified petitioner by his nickname,

---

**17.** In this Court, petitioner moved to estop respondent from relying on Robyn Lewis' testimony that she saw petitioner meet with Neil Woodman at Manchester Products because, according to petitioner, the State had "con-ceded" that Ms. Lewis' testimony was untrue. The Court denied petitioner's motion finding that their was no evidence suggesting that such a concession was ever made by the State. (10/5/04 ERT 20–24.)

"Sonny," and stated that she did not recall who "Sonny" went to see because the phones were "heavy." Ms. Lewis was also unable to recall which office petitioner visited. Ms. Lewis never referred to petitioner by his last name.

### 2. *Lewis' testimony at petitioner's trial*

At petitioner's trial, Ms. Lewis testified that petitioner came to Manchester Products, possibly in September 1985, to apply for a job. (RT 8708–09.) Ms. Lewis specifically remembered petitioner's unusual last name (RT 8784) and recalled that Neil Woodman had been expecting him (RT 8720). Ms. Lewis testified that after she handed petitioner an employment application, "he walked with Neil into Neil's office." (RT 8719.) That particular day, petitioner was the only applicant. (RT 8783.)

### 3. *Lewis' testimony at the evidentiary hearing*

At the evidentiary hearing, Ms. Lewis testified that she still remembered petitioner by his unusual last name. She testified that she did not know where she first heard the name "Sonny," and explained that she did not reveal to Detective Holder that petitioner came to see Neil Woodman because she was "nervous." (3/10/04 RT 297.)

Ms. Lewis consistently stated, both to Detective Holder and under oath, that she greeted petitioner at Manchester Products sometime in September 1985. Although she has exhibited some inability to recall specific details of the meeting, she has never equivocated about her identification of petitioner as the man she saw at Woodman's place of business. Ms. Lewis has also consistently testified that she remembered petitioner because of his unusual last name. The fact that she did not refer to petitioner by his last name when interviewed by Detective Holder does not establish that petitioner's unusual last name

was something Ms. Lewis did not remember.

Moreover, the statement of Neil Woodman's attorney at side-bar in the federal RICO trial is not evidence of Ms. Lewis' untruthfulness. To the contrary, it is an argument that would be expected from Neil Woodman's defense counsel and is apparently not based on any actual evidence. Neither is this Court moved by the fact that Ms. Lewis was not called as a witness in the subsequent trials. Ms. Lewis' testimony was only relevant to the nexus between petitioner and Neil Woodman. Given the weight of the evidence against Neil Woodman, Ms. Lewis' testimony would have done little to advance the prosecution's case.

Thus, this Court does not find that Ms. Lewis' testimony that she saw petitioner meet with Neil Woodman at Manchester Products in September 1985, has been impeached by petitioner. The Court finds her account to be credible.

### D. Roger Backman

Next, petitioner points to the testimony of Roger Backman as evidence that petitioner could not have been the "Ninja." As detailed above, Mr. Backman described the hooded assailant as resembling Michael Dominguez. While this evidence may suggest that petitioner was not the "Ninja" who came face to face with Mr. Backman, it does not prove that petitioner is innocent of the murders of Gerald and Vera Woodman. It is undisputed that the murders were carried out by more than one individual. In fact, Mr. Backman testified that while he saw the "Ninja," he heard another individual running through the bushes. Thus, Mr. Backman's description of the "Ninja" does not support a finding that petitioner was not a participant in the murders.

### E. Richard Altman

Petitioner also suggests that the testimony of Richard Altman, the other party involved in the traffic accident with Robert Homick, supports petitioner's claims of actual innocence as it bolsters Dominguez's credibility. (Pet. Pre–Evidentiary Hearing Brief, p. 27.) At the second trial, Mr. Altman testified that he spent about five minutes talking with Robert Homick after the accident and that he stood "some 5 to 10 feet away from [Robert Homick's vehicle]." (99 Homick RT 11068.) Mr. Altman further testified that he "didn't see anybody" in Robert Homick's car at the time of the accident. (99 Homick RT 11045.)

Mr. Altman's testimony does nothing to further petitioner's procedural claim of actual innocence. The jury was presented with evidence that Steve Homick and Michael Dominguez did not encounter Robert Homick until sometime after the accident. Further, there was no mention of Mr. Altman being present when Steve and Dominguez arrived. (RT 11996–99.) Not only would it have been possible for the second individual to have entered Robert's vehicle sometime after Mr. Altman left but before Steve and Dominguez arrived, but it is also possible that the second individual allegedly seen by Dominguez inside Robert's car could have been hiding while Robert spoke with Mr. Altman. Such interpretation is supported by Dominguez's testimony that the individual attempted to duck down and hide when Steve and Dominguez pulled next to Robert's car. (3/9/04 ERT 172.)

### F. Stewart Woodman

Petitioner's claim also relies in part on Stewart Woodman's testimony at the Second and Third Trials that he did not know petitioner before meeting him in jail. (Pet. Pre–Evid Hearing Brief, p. 31.) Again, this is of little significance to petitioner's procedural claim of actual innocence. It is unlikely that the jury would have given much weight to the fact that Stewart Woodman did not know petitioner, particularly in light of the fact that there is no evidence that either of the Woodman brothers were acquainted with Michael Dominguez, who admitted to participating in the murders. There was no reason for the Woodmans to have any direct contact with individuals that assisted the Homicks. Moreover, the fact that Stewart Woodman had never met petitioner does not negate the evidence that petitioner met with Neil Woodman and that petitioner had the phone number for Manchester Products listed in his address book.

## V. CONCLUSION

In light of the evidence of record and the credibility determinations of this Court, petitioner can not show, and this Court cannot conclude, "that it is more likely than not that no reasonable juror would have convicted him." *Schlup* at 327, 115 S.Ct. 851. This Court has determined that the testimony of Michael Dominguez is not worthy of belief. None of the other "new" evidence presented by petitioner, without the support of a credible recantation by Dominguez, is sufficient to meet petitioner's procedural claim of actual innocence.

Indeed, petitioner's procedural claim of actual innocence is not "truly extraordinary" by any measure. *Id.* Thus, petitioner has not met "the exacting standard established by the Supreme Court in *Schlup* for overriding [ ] petitioner's clear failure to meet deadlines and requirements for filing a timely petition in [this Court]." *Majoy v. Roe*, 296 F.3d at 775.

## RECOMMENDATION

For all of the foregoing reasons, it is recommended that the court issue an order: (1) approving and adopting this re-

port and recommendation; and (2) directing that judgment be entered denying dismissing the instant petition with prejudice as untimely filed.